JEFFER, MANGELS, BUTLER & MARMARO LLP
BENJAMIN M. REZNIK (Bar No. 72364)
PAMELA S. SCHMIDT (Bar No. 128950)
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567

*Attorneys for Plaintiffs*
GEOFFREY PALMER and
PALMER BOSTON STREET PROPERTIES II,
a California limited partnership

FILED
2003 SEP -8 PM 3:59
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| GEOFFREY PALMER, an individual; and PALMER BOSTON STREET PROPERTIES II, a California limited partnership;<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES; CITY OF LOS ANGELES DEPARTMENT OF BUILDING AND SAFETY; COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES; AND DOES 1- through 10, inclusive,<br><br>Defendants. | CASE NO.: CV 03-6402 SVW (RCx)<br><br>COMPLAINT FOR VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983, AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs GEOFFREY PALMER and PALMER BOSTON STREET PROPERTIES II, though the undersigned attorneys, allege as follows:

ENTER ON ICMS
SEP 10 2003

ORIGINAL

PRINTED ON RECYCLED PAPER

3128876v5

Complaint

ORIGINAL

```
9/8/2003 4:07:43 PM   Receipt #: 47410
      Cashier : ABELLAMY [LA 1-1]
Paid by: WORLDWIDE NETWORK
2:CV03-06402
2003-086900        5 - Filing Fee Civil(1)
Amount :                            $60.00
2:CV03-06402
2003-510000       11 - Special Fund F/F(1)
Amount :                            $90.00
Check Payment : 2342 /              150.00
Total Payment :                     150.00
```

## JURISDICTION

1. This action is based on, and seeks to redress violations of, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States.

## VENUE

2. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and because the Defendants reside in this District and the events giving rise to Plaintiffs' claims occurred in this District.

## INTRODUCTION

3. Defendant the City of Los Angeles (the "City"), acting through the Department of Building and Safety of the City of Los Angeles ("DBS"), found that a dilapidated structure on property owned by Plaintiff Palmer Boston Street Properties II ("Boston Street") was a nuisance and ordered it abated. However, Boston Street's demolition permit was not issued by the DBS, because the Community Redevelopment Agency of the City of Los Angeles, which is the agency charged with implementing redevelopment in the area, would not grant a clearance, nor take any other action in respect of the demolition permit request, as required by law.

4. When the building was demolished more than two years after the demolition permit was requested, and months after DBS declared it a public nuisance and hazard that Boston Street was required to remove, the City embarked on a politically motivated course of action, removing Boston Street's development rights under the City's "Scorched Earth Ordinance" and filing a criminal complaint against Boston Street's general partner, Plaintiff Geoffrey Palmer. At this time Palmer was involved in a lawsuit against the City regarding a project a few blocks away, in which Palmer alleged that the application of the City's Central City West Specific Plan violated State and Federal laws.

5. Plaintiffs have been deprived of their rights to procedural and substantive due process by the actions of Defendants. Accordingly, Plaintiffs seek relief from this Court from the illegal, arbitrary, capricious and irrational actions of the Defendants.

## THE PARTIES

6. Plaintiff, Palmer Boston Street Properties II ("Boston Street"), is a California limited partnership lawfully doing business in the State of California. The general partner of Boston Street is an individual, Plaintiff Geoffrey Palmer.

7. Defendant City of Los Angeles ("City") is a municipal corporation, and charter city, organized and existing under the laws of the State of California, with the capacity to sue and be sued. As used herein, the term "City" includes, but is not limited to, City employees, agents, officers, boards, commissions, departments, and their members, all equally charged with complying with duties under the City Charter, and with the laws of the State.

8. Defendant City of Los Angeles Department of Building and Safety ("DBS") is the Department with the authority and duty to issue demolition permits. DBS is the department of the City with the specific charge and mandate to enforce the City's Building and Zoning Codes.

9. Defendant Community Redevelopment Agency of the City of Los Angeles ("CRA") is a public agency established pursuant to California Health & Safety Code § 33100 *et seq.* As used herein, the term "CRA" includes, but is not limited to, CRA employees, agents, officers, commissions, departments, and their members.

10. Plaintiffs do not know the true names or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10, inclusive, and therefore sue said Defendants under fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when and if the same have been ascertained.

11. Each Defendant is the duly authorized agent, servant, representative, co-conspirator, and/or alter-ego of each of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of their respective authority as agents and with the permission and consent of the other Defendants, and each Defendant having ratified the acts of each of the other Defendants.

## THE PROPERTY AND THE STRUCTURE

12. The property which has been the subject of the dispute between Boston Street and the City is located at 840 to 844 W. Cesar E. Chavez (the "Property"). The legal description of the Property is as follows:

LOT 17 IN BLOCK 3 OF PARK TRACT, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 7 PAGES 26 AND 27 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF LOS ANGELES COUNTY.

EXCEPT THE NORTHEASTERLY 17.5 FEET OF SAID LOT, CONDEMNED FOR WIDENING SUNSET BOULEVARD.

13. A structure that had become known as the "Giese Residence" (the "Structure") was located on the Property. Originally a single-family residence built in the 1880's, the Structure was uprooted, placed atop another building, and converted into a 4-unit apartment in the 1920's. On February 12, 2001, Boston Street applied for a demolition permit for the Structure and nine other residential buildings. This Structure was not an officially designated historic structure. It was not on the National Register of Historic Places, the California Register of Historic Resources nor was it included on the City of Los Angeles list of historical and cultural monuments. Indeed, the Structure was not even nominated to be on any of these lists, nor had it been deemed eligible for addition to any of these registers.

14. In the early 1980s, the CRA hired an expert in historic resources to evaluate all buildings within the Chinatown Redevelopment Plan area, including the Structure. That expert, Roger Hatheway, did not determine that the Structure was

eligible for listing on the National Register. He found only that the Structure was "potentially" significant.

15. In or about 2001 through early 2002, Mr. Hatheway conducted a historic survey of nearly an entire city block Boston Street has purchased. In that survey, Mr. Hatheway concluded about the Structure: "This building is not the work of a master, and does not possess high artistic values. Like nearly every building ever constructed it displays minimal characteristics of a type, period, region, or method of construction. This building does not display extraordinary or distinctive characteristics that would distinguish it from a multitude of similar properties found throughout southern California and/or the Los Angeles area. Finally, it is not the first or last example of its type remaining in the greater Los Angeles area."

16. By mid-2002, the ravages of time and the incessant and unstoppable break-ins by vagrants and criminals had stripped the Structure of even this marginal interest.

## PLAINTIFFS' EFFORTS TO ABATE THE THREAT TO PUBLIC SAFETY CREATED BY THE STRUCTURE

17. In February 2001, Boston Street submitted an application with the DBS for a demolition pre-inspection. The purpose of such an inspection is to determine whether demolition presents any safety concerns. The DBS inspected the building and determined that there were no such safety concerns. Boston Street then submitted an application for a demolition permit with the DBS. The DBS concluded that clearances for the permit were needed from the CRA, since the Structure was in a redevelopment area, and the Housing Department, to ensure that no tenant rights were violated.

18. While Boston Street awaited clearances from those two agencies, it performed a variety of tasks to determine whether there was an alternative to demolishing the building, and, if not, to ensure that the demolition could take place safely and expeditiously. In order to determine whether there was an alternative to demolition, Boston Street hired Edmond Babayan, a structural engineer, to evaluate the

building and determine the feasibility of relocating it to another site. Mr. Babayan evaluated the building in August 2001 and concluded that much of the building was "severely deteriorated" and that more than fifty percent of the building would have to be removed and replaced before it could be safely relocated. In short, relocation was not feasible. Given that demolition appeared to be the only realistic option, Boston Street completed the various tasks required to ensure a safe demolition.

19. On June 11, 2002, over a year after Boston Street filed its application for a demolition permit, the Housing Department gave its approval, leaving only CRA clearance outstanding. On that same date, Boston Street filed, as directed by DBS, an application for a clearance from the CRA so that the demolition permit could be issued. With its application, Boston Street submitted a comprehensive report by Mr. Hatheway, who had performed an updated evaluation of the Structure. In his report, Mr. Hatheway opined that, due to significant vandalism, the building had deteriorated to the point where it no longer possessed historical significance. The report stated that the building was not associated with any events of historical significance and that although it was part of a period of development known as "Boom of the Eighties," it was not part of "the first, last or most significant Tract developed in association" with that time period. Mr. Hatheway noted that the only marginally historical figure associated with the building was Henry Giese, but even he did not have a "lasting [historical] impact." As far as its architecture, Mr. Hatheway declared that the "building is not the work of a master, and does not possess high artistic values." Mr. Hatheway concluded that although the building did at one time maintain certain distinctive architectural features, those features had been destroyed by the ongoing vandalism. In short, according to Mr. Hatheway, "the architectural integrity of the building's material fabric had been compromised." Mr. Hatheway also presented a second opinion from a respected architect, Alan S. Boivin, who similarly concluded that the Structure was "simply a very damaged and gutted shell."

20. With its application to the CRA, Boston Street also submitted a notice that had recently been issued by the DBS, which declared that the building was in such a dilapidated state that it constituted a nuisance. The notice directed Boston Street to either repair or demolish the Structure and that failure to do so could result in both civil and criminal penalties. The notice further warned the DBS may institute proceedings to cause the Structure to be demolished and that the cost of demolition and removal plus administration fees will be assessed and recorded as a lien against the Property. The notice, however, informed Boston Street that "a permit is required before repair or demolition is started." As a result, Plaintiffs were caught 'between a rock and a hard place.' The DBS was threatening them with civil and criminal sanctions if he did not do something with the Structure, but at the same time they could not touch the Structure until the CRA approved a permit.

21. While the CRA sat on the application, the situation grew even more precarious. Boston Street, seeking to cooperate with the concerns of the DBS, fenced and barricaded the seriously dilapidated Structure. Transients and gang members, however, stymied Boston Street's efforts to secure the Structure. A repetitious cycle began where transients and gang members repeatedly broke down the barricades designed to secure the Structure within days of their construction. During the spring and summer of 2002 alone, Palmer re-barricaded the Structure a half a dozen times. Each time, gang members, dope fiends, and transients immediately breached the barricades. The DBS acknowledged that Palmer was making every effort to cooperate, but to no avail.

22. The criminal activity essentially turned the Structure into a "crack house." The DBS and the Los Angeles Police Department noted that gang members were spray-painting all sorts of graffiti on the building, including "colorful" expressions such as "LA Shit." Transients were starting fires in the building. The inside smelled of urine and "human waste of other types." Several street robberies were reported in

front of the building. A dead body was even found inside. In short, the Structure was a disaster area.

23. Despite the dangerous situation presented, the CRA did not act on Boston Street's application within the thirty-day statutory time limit established by California Public Resources Code § 21080.2, part of the California Environmental Quality Act ("CEQA"), California Public Resources Code §21000 *et seq*. It appears that the delay was due to the fact that the CRA was receiving pressure from the office of Councilmember Ed Reyes, who supposedly wanted to "save" the Structure by relocating it within his district.

24. Over two months after Palmer filed his application, the CRA finally took some action. On August 15, 2002, the CRA issued a notice indicating that it had completed an initial study and intended to adopt a mitigated negative declaration ("MND") to allow for demolition of the Structure. The notice described the project as a "demolition of a dilapidated residential Structure in order to abate the nuisance created by it." The notice also specifically indicated that the demolition would not have a significant effect on an historical resource. Given the notice, it seemed that the much-needed demolition would finally be approved, eliminating the dangerous and potentially life-threatening situation that existed. The CRA specifically informed Councilmember Reyes's office as to the proposed action, and gave the public until September 9, 2002 to comment.

25. The CRA received three letters from the public suggesting that the Structure should be saved. However, none of the letters presented any evidence that the Structure still had any historical significance. Plaintiffs submitted to the CRA a letter from Mr. Hatheway. Mr. Hatheway explained that the Structure "is a mere shell of what I looked at and determined to be potentially eligible in 1982. This is a sad but true fact. . . . My decision to 'rescind' my earlier determination of significance for the [Structure] was not made without considerable thought. If anything, I am deeply saddened by the twenty-year decline in the condition and integrity of the building."

1  Thus the only expert opinion before the CRA on the issue of historical significance
2  was the analysis conducted by Mr. Hatheway, which demonstrated that the Structure
3  had seriously deteriorated, constituted a nuisance and no longer was of any potential,
4  let alone actual, historical significance.

## THE CRA FLOUTS ITS LEGAL OBLIGATIONS

26. In anticipation that the CRA would be issuing an MND for demolition of the Structure, on September 11, 2002 the DBS communicated to the CRA its desire that the Structure should be demolished.

27. Despite the fact that no contrary evidence had been submitted, and despite the fact that the only expert to have evaluated the Structure, Roger Hatheway (who was originally hired by the CRA), had determined that it did not possess historical significance, the CRA informed the DBS on September 16, 2002 that it would require the preparation of an EIR under CEQA. The CRA explained to the DBS that even though it "no longer believed that the building [wa]s significant," based on the evidence submitted, the CRA was nevertheless refusing to issue an MND because the Los Angeles Conservancy ("LAC") "feels it [the Structure] should be saved." Although the CRA apparently gave this notification to the DBS verbally, it did not issue certified notices to all of the relevant public agencies, within the time limits under CEQA and the City's own regulations. In fact, it does not appear that the CRA ever issued such notices. Not only did the CRA fail to issue the required notices signifying the commencement of the EIR process, it ignored CEQA's command that the EIR process be carried out "in the most efficient, expeditious manner" possible. Although under CEQA it was the responsibility of the CRA, not Boston Street, to prepare the EIR, the CRA failed to undertake any effort to do so. In short, the CRA was stalling in contravention of the express dictates of CEQA.

28. Meanwhile, as to the public nuisance aspects, the DBS was not stalling, as it wanted "to try to get the building demolished so that it [would] no longer [be] a problem for the neighborhood." The problems for the neighborhood had been flagged

by the FALCON Narcotics Abatement Unit, a multi-agency task force that was particularly concerned with the Structure's attraction of criminal activity. In addition, a Los Angeles Police Department officer who worked the Chinatown beat submitted a sworn declaration to DBS that the Structure was a nuisance. The officer stated that he had seen transients living on the property, that they were stripping the Structure and selling the materials, and that there was a grave concern that they may burn the Structure down. The officer further indicated that the Structure was "a meeting site for members of the 'VSR' street gang" and that the gang's graffiti covered the Structure. Furthermore, both the gang members and the transients were committing a variety of street crimes near the Structure.

29. Given these problems, the DBS noticed a public hearing for December 17, 2002 before the Board of Building and Safety Commissioners ("BBSC") to determine whether the Structure did in fact constitute a public nuisance and what should be done about the problem. The hearing went forward as planned. One of the BBSC commissioners found that "based on the photographs, it seemed that the building was beyond repair and that it appeared as though the entire building would collapse" and that, in any event, "relocation may just achieve the relocation of a nuisance to another site." The BBSC also specifically found, among other things, that: (1) "The existing structure is severely fire damaged and that portions of the floor of the structure [we]re buckling." (2) "The building is vacant, has been previously secured, but is now open to unauthorized entry and used repeatedly without the owner's permission by vagrants or for other illegal purposes." (3) "Concerned persons residing in the area expressed support for demolition of the building and the elimination of the nuisance conditions." Given these findings, the BBSC <u>ordered that Palmer had no additional time to abate the nuisance</u>.

### DEFENDANTS PUT PLAINTIFFS INTO A LEGAL CATCH-22

30. Despite the findings of the BBSC and the constant efforts of Boston Street and its counsel to persuade it to take action, the CRA was still stalling. It still

had not commenced the EIR process or signed off on the demolition permit. Instead, it was stalling while the LAC and the office of Councilmember Reyes sought someone who would be willing and able to move the Structure to another location. Although months had gone by, nobody had stepped forward with a feasible plan to relocate the Structure. In approximately January of 2003, the CRA hoped that a potential interested party, Barbara Behm, would be willing to undertake the relocation efforts. From the beginning, however, Ms. Behm was particularly concerned about the costs of such a project. Although the CRA continued to hope that Ms. Behm would relocate the Structure, she was not willing to devote the resources to such a project. On April 17, 2003, after months of inaction, officials from the CRA met with Ms. Behm and a representative of the LAC at Councilmember Reyes's office. Plaintiffs were not invited to the meeting. The fact that the meeting took place at Councilmember Reyes's office reflects the administrative officials' willingness to placate the political interests of certain special interest groups. At the meeting, the discussion focused on Ms. Behm's ability to relocate the Structure. Ms. Behm, however, informed the CRA that she could not absorb the extensive costs of relocation and that, in essence, these costs did not "make the project economically feasible." Indeed, Ms. Behm was only interested in moving the second floor, thus requiring her to detach this portion of the Structure from the first floor, which she did not want. Still, the CRA refused to issue the MND. On the one hand, the BBSC was threatening civil and criminal liability if Plaintiffs did not abate the substantial public nuisance and hazard created by the Structure. The Plaintiffs were also under the constant threat of civil liability from third parties who may become injured due to the condition of the Structure or the criminal activities occurring therein. On the other hand, the CRA refused to take any action because Councilmember Reyes wanted the Structure or a portion of it moved, yet <u>no one</u> was willing to shoulder the high cost of moving and essentially reconstructing this "damaged shell" into a habitable building. The only person that Councilmember Reyes

could locate was not even interested in the entire Structure, just the second floor. Plaintiffs were in a legal Catch-22.

31. On or about April 19, 2003, the Structure was demolished. After learning of the demolishment of the Structure, the CRA, which had not done anything for approximately eight months, informed Plaintiffs in a letter dated May 2, 2003, that it "did not, and could not," sign off on a demolition permit because an EIR was required. The CRA's letter was a transparent attempt to cover itself in anticipation of claims that it failed to comply with CEQA. For example, although the CRA had previously explained that it was pursuing an EIR even though it did not believe that the Structure had historical value, it now made the contrary claim, unsupported by any shred of evidence, that it had in fact determined that the Structure possessed historical significance.

32. After the demolishment of the Building, the City Council ordered the DBS to impose the "Scorched Earth Ordinance" (Section 91.106.4.1(10) of the Los Angeles Municipal Code) on the Property to prevent its development for five years. The City Council also ordered the City Attorney to criminally prosecute Plaintiffs.

## CLAIM FOR RELIEF

## Violation of 42 U.S.C. § 1983 Through Violation of The Right to Due Process Protected by The Due Process Clause and Equal Protection Clause of The Fourteenth Amendment

33. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 33 above, and incorporate those allegations herein by this reference.

34. Defendants, acting under color of state law and in violation of 42 U.S.C. § 1983, have deprived Plaintiffs of the rights, privileges or immunities secured by the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

35. In particular, the CRA violated Plaintiffs' rights to procedural and substantive due process by, among other things:

    (a) Failing to timely act on the application for a demolition permit by determining that the application was exempt, issuing an MND, preparing an EIR or otherwise complying with CEQA;

    (b) Refusing to issue an MND even though there was no evidence that the demolition would have an adverse effect on an historic resource;

    (c) Allowing political considerations to influence its decision-making process, rather than following its legal duties to process the application for a demolition permit; and

    (d) Exposing Plaintiffs to substantial risk of civil and criminal liability arising out of the public nuisance and hazard created by the Structure by illegally declining to clear the demolition permit, which demolition would abate such public nuisance and hazard.

36. The CRA also violated Plaintiffs' rights to procedural due process and substantive due process by purportedly requiring an EIR to be prepared after the Building had been declared a nuisance by the BBSC. CEQA sets forth certain exemptions from the EIR requirement, two of which were applicable, yet ignored by the CRA. First, there is an exemption for "[s]pecific actions necessary to prevent or mitigate an emergency." California Public Resources Code § 21080(b)(4). "'Emergency' means a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage." Public Resources Code § 21060.3. In this instance, the findings of the DBS and the BBSC, and the evidence presented at the December 17, 2002 hearing, reveal that the "emergency" exemption applied, and therefore an EIR was not required. Pursuant to Public Resources Code § 21084, guidelines have been promulgated which exempt projects from the EIR requirement. One of those guidelines provides that an exemption is created when there has been an

adoption of an administrative decision or order by a regulatory agency to enforce a general rule, standard, or objective. Cal. Code Regs., tit. 14, § 15321(a)(2). This categorical exemption was triggered when the DBS and the BBSC declared the Structure a public nuisance requiring abatement. Despite the clear dictates of the law that no EIR or MND was required after DBS and the BBSC found the Structure to be a nuisance and public hazard, the CRA refused to make a decision, and then, after the Structure had been demolished, stated for the first time in writing that an EIR was required.

37. The DBS violated Plaintiffs' rights to procedural and substantive due process by issuing an abate order and then refusing to issue the requested demolition permit needed to comply with the abate order. If the CRA was violating the law by not taking the required action, the DBS should have issued the permit. In particular, once the need for an EIR or an MND had been eliminated by the findings of both the DBS and BBSC that the Structure was a public nuisance and hazard, DBS should have issued the demolition permit.

38. Defendants have been faced with situations involving the destruction of allegedly historic buildings without all of the proper permits having been issued. In one case, a few months before the demolishment of the Structure, the University of Southern California ("USC") demolished an allegedly historic building without a permit under more egregious circumstances. On March 22, 2002, USC submitted an application to the CRA for approval to demolish a circa 1905 apartment building in fair shape located at 921 W. 30th Street, which is located in the Hoover Expansion Redevelopment Project Area. With its application, USC submitted an expert report indicating that the apartment building was not an historical resource. The CRA decided to prepare an initial study in order to evaluate the potential historical resource. However, on May 29, 2002, USC withdrew its application, and then, several weeks thereafter, went ahead and demolished the building without a permit. The facts of the USC case were presented to the City Attorney's Office, which declined to prosecute,

and the City never invoked the Scorched Earth Ordinance. As a final contrast in the handling of the two cases, the CRA and the DBS ultimately approved the issuance of a demolition permit to USC after the fact. The CRA and the DBS concluded that the USC demolition was categorically exempt from CEQA because the DBS determined, after the building had been mostly demolished, that the remains were hazardous and needed to be removed. Of course, Plaintiffs has received no such assistance in obtaining an after-the-fact permit. Accordingly Plaintiffs did not receive equal protection of the laws from the City, the DBS or the CRA as the City has engaged in selective prosecution of its criminal and administrative laws.

39. The City has violated Plaintiffs' rights to procedural and substantive due process by imposing a five year moratorium on the development rights over the Property and seeking to criminally prosecute Plaintiffs for taking measures to protect public health and safety that were required by the enforcement arm of the City, the DBS, but were illegally frustrated by the planning arm of the City, the CRA.

40. As a direct and proximate result of the forgoing, Plaintiffs have been damaged in the amount subject to proof at trial, but in any event in excess of Ten Million Dollars ($10,000,000). Such damages include, without limitation, those arising out of Plaintiffs' pursuing the demolition permit, Plaintiffs' inability to abate the nuisance and to proceed with redevelopment of the Property, including delay costs and lost profits, Plaintiffs' defending the civil and criminal prosecutions, and the impairment of Plaintiffs' reputation.

41. Plaintiffs are further entitled to their attorneys' fees pursuant to 42 U.S.C. § 1988.

42. Plaintiffs are further entitled to equitable relief, including, without limitation, a mandatory injunction requiring DBS to issue a demolition permit effective as of December 17, 2002 (the date of the final abatement order from the BBSC); an order enjoining the City from criminally prosecuting Plaintiffs; and an order requiring the City to remove the five-year freeze on development of the Property that it illegally

imposed pursuant to the Section 91.106.4.1(10) of the Los Angeles Municipal Code, otherwise known as "Scorched Earth Ordinance".

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs prays for judgment against Defendants as follows:

1. For damages in the amount of at least $10,000,000, according to proof;
2. For equitable relief including, without limitation, a mandatory injunction requiring DBS to issue a demolition permit effective as of December 17, 2002; an injunction prohibiting the City from criminally prosecuting Plaintiffs; and a mandatory injunction requiring the City to remove the five-year freeze on development of the Property that it imposed pursuant to the Section 91.106.4.1(10) of the Los Angeles Municipal Code.
4. For attorneys' fees pursuant to 42 U.S.C. § 1988;
5. For pre-judgment interest at the appropriate legal rate;
6. For the costs of suit incurred herein;
7. For such other and further relief as the Court deems just and proper.

DATED: September 8, 2003

JEFFER, MANGELS, BUTLER & MARMARO LLP
BENJAMIN M. REZNIK
PAMELA S. SCHMIDT

By: /s/ Benjamin M. Reznik
BENJAMIN M. REZNIK
*Attorneys for Plaintiffs*
GEOFFREY PALMER and
PALMER BOSTON STREET
PROPERTIES II

## JURY DEMAND

Plaintiffs Geoffrey Palmer and Palmer Boston Street Properties II demand a jury trial as provided by the Federal Rules of Civil Procedure.

DATED: September 8, 2003

JEFFER, MANGELS, BUTLER &
  MARMARO LLP
BENJAMIN M. REZNIK
PAMELA S. SCHMIDT

By: _____
    BENJAMIN M. REZNIK
*Attorneys for Plaintiffs*
GEOFFREY PALMER and
PALMER BOSTON STREET
  PROPERTIES II,